**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3804-16T3

MERCER COUNTY CHILDREN'S
MEDICAL DAYCARE, LLC,

      Petitioner-Appellant,

v.

DIVISION OF MEDICAL
ASSISTANCE AND HEALTH
SERVICES, and OFFICE OF THE
STATE COMPTROLLER,
MEDICAID FRAUD DIVISION,

      Respondents-Respondents.

_____

Submitted February 11, 2019 – Decided August 8, 2019

Before Judges Fasciale, Gooden Brown and Rose.

On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.

Law Offices of Edward P. Vidal, attorney for appellant (Edward P. Vidal, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondents (Melissa H. Raksa, Assistant Attorney

General, of counsel; Arundhati Mohankumar, Deputy
Attorney General, on the brief).

PER CURIAM

Mercer County Children's Daycare, LLC (Mercer), a now defunct pediatric medical day care facility, appeals from the March 10, 2017 final agency decision of the Director of the Division of Medical Assistance and Health Services (DMAHS), adopting, as modified, the initial decision of the administrative law judge (ALJ). The ALJ determined that Mercer billed Medicaid for children who did not satisfy the eligibility criteria for pediatric medical day care (PMDC)[1] services, as set forth in N.J.A.C. 8:86.[2] As a result,

---

[1] According to the ALJ, the PMDC program

> was created pursuant to [N.J.S.A.] 30:4D-6(b)[(17)], which gives DMAHS authority "[s]ubject to the limitations imposed by federal law" to expand medical assistance services past the traditional doctor and hospital visits to include "[a]ny other medical care and any other type of remedial care recognized under State law, specified by the Secretary of the federal Department of Health and Human Services, and approved by the commissioner." The federal authority for the program is derived from 42 [U.S.C.] § 1396(a) and 42 [C.F.R.] § 440.90.

[2] As of January 2, 2001, N.J.A.C. 8:86-1.1(a) permitted PMDC services "only for technology-dependent and/or medically unstable children who require[d] continuous, rather than part-time or intermittent, care of a licensed practical

Mercer was required to reimburse Medicaid for overpayments and damages. For the reasons that follow, we affirm.

I.

By way of background, since 2003, Mercer provided PMDC services to at-risk and Medicaid eligible children up to the age of five in the Trenton area. In 2004, the Office of the State Comptroller, Medicaid Fraud Division (MFD), launched an investigation into Mercer's billing practices after receiving a tip alleging overbilling. The investigation lasted approximately seven years, during which MFD reviewed a sample[3] of medical records maintained for each child by both Mercer and the child's pediatrician. As a result of the investigation, in a March 28, 2011 Notice of Claim, MFD alleged that Mercer "violated the [p]urpose and [s]cope of Pediatric Day Health Services, pursuant to N.J.A.C.

---

[LPN] or registered professional nurse [RN] in a developmentally appropriate environment." Effective February 1, 2006, the eligibility criteria changed. Then, under N.J.A.C. 8:86-1.5(i), the eligibility criteria for PMDC services included the requirement that a Medicaid beneficiary be five years of age or under, require "continuous nursing services available only in a pediatric day health services facility," and be "technology dependent, requiring life-sustaining equipment or interventions," or "medically unstable requiring ongoing treatment administered by a [RN] or [LPN] such as nebulizer treatment, administration of oxygen, apnea/cardiac monitoring, or intermittent urinary catheterization, to maintain health . . . ."

[3] The files reviewed consisted of a sample of "the universe of the case[s,]" determined by MFD's Data Mining Unit "to be representative of the whole."

A-3804-16T3

8:87-1.1[,]" by enrolling "non-eligible Medicaid recipients" and improperly billing Medicaid for PMDC services for the period from "March 22, 2004[,] through December 8, 2010." In addition, the Notice of Claim indicated that "[u]pon learning that an enrolled recipient no longer met eligibility criteria due to a change in the child's medication and treatment requirements," Mercer "failed to discharge the recipient from care and continued to bill . . . Medicaid for services[,]" in violation of "N.J.A.C. 8:87-3.1 through N.J.A.C. 8:87-3.4."

The Notice of Claim and accompanying Certificate of Debt[4] served upon Mercer sought to recover $3,101,377.95 in overpayments, pursuant to N.J.S.A. 30:4D-7(h), and $9,304,133.85 in treble damages, pursuant to N.J.S.A. 30:4D-17(e), for a total of $12,405,511.80. The Notice attached "a summary of the amounts and the number of claims" for which recovery was sought. The Notice also informed Mercer that pursuant to N.J.S.A. 30:4D-17(i), MFD would "immediately begin withholding [thirty percent[5]] of [Mercer's] future program reimbursements until the full amount of the overpayment and interest . . . [was]

---

[4] The certificate of debt was filed with the Clerk of the Superior Court and docketed as a judgment against Charles M. Bunting III and Michelle L. Bunting, Mercer's principals.

[5] Ultimately, DMAHS withheld only twenty percent of Mercer's reimbursements.

A-3804-16T3

withheld, or until [a] final adjudication . . . , whichever [was] earlier." Additionally, the Notice advised Mercer of its right to dispute the claim by requesting a pre-hearing with the agency, or a formal hearing before the Office of Administrative Law (OAL), in accordance with N.J.A.C. 10:49-10.3.[6]

On February 7, 2012, Mercer requested a fair hearing to challenge the claim. As a result, the case was transferred to the OAL. See N.J.S.A. 52:14B-1 to -15; N.J.S.A. 52:14F-1 to -13. On October 3, 2013, MFD issued an Amended Notice of Claim and corresponding Certificate of Debt, limiting the total recovery sought to $6,202,755.90, based on a reduction of the damages assessed to "single damages." After several adjournments at both parties' requests, a six-day hearing was conducted on various dates in 2015 and 2016,[7] during which the ALJ adjudicated various discovery disputes and addressed several legal issues raised by Mercer.

Based on the ALJ's rulings, in a May 1, 2015 letter, MFD notified the ALJ and Mercer of various changes to its recovery action. Specifically, MFD (1) "restricted the time frame for which it was seeking recovery" to "2005 through

---

[6] The Notice specified that the "[f]iling of the Certificate of Debt [did] not affect [Mercer's] hearing rights."

[7] During 2015, Mercer changed attorneys twice, ultimately electing to proceed pro se.

2009"; (2) identified the sixteen children involved; (3) changed its reliance on N.J.A.C. 8:87, as cited in its Notice of Claim, to N.J.A.C. 8:86 "to support the recovery sought"; and (4) further reduced the amount sought to $1,959,164.22 in overpayments and $1,959,164.22 in damages, for a total of $3,918,328.44. MFD attributed the change in the regulation to the fact that N.J.A.C. 8:86, rather than N.J.A.C. 8:87, was the governing regulation "for the years relevant to the recovery time period," and explained that "[t]he regulation ha[d] been revised throughout the years[.]"

Notably, in denying Mercer's application to reject the change and limit MFD "to the allegations and claims set forth in its [Notices of Claim/Withhold]," the ALJ explained that

> even if [MFD] did not clearly articulate its intent to rely on [N.J.A.C.] 8:86 until somewhere between July 2014 and May 2015, . . . any prejudice to Mercer has been cured by the lengthy period afforded [to Mercer] between the second and third day of hearing, a period in which [Mercer] procured an expert witness whose testimony incorporated the concepts of [N.J.A.C.] 8:86.

At the hearing, a total of nine witnesses testified, consisting of MFD's supervising medical review analyst, Kathleen Donnelly[8]; MFD's medical review

---

[8] Donnelly's testimony was limited to explaining how the "data mining" process supported the work of MFD's auditors and investigators by retrieving "claims

analysts, Marianne McCafferty and Rita Smith; MFD's medical records analyst, John Kelly[9]; and representatives of Medicaid's fiscal agent,[10] Peter Ringel and Richard Tilghman.   The witnesses testified about their respective roles in Medicaid fraud investigations in general, and their specific involvement with the investigation of Mercer's alleged improper billings.   Beverly Grissom,[11] owner and vice president of Horizon Pediatric Systems, Mercer's parent company, testified for Mercer.  In addition, Dr. Thomas Lind, DMAHS' Medical Director, and Dr. Steven Kairys, Chairman of Pediatrics at Jersey Shore University Medical Center and a Professor of Pediatrics at Robert Wood Johnson Medical School, both testified as experts in pediatrics on behalf of MFD

---

data" for specific cases to "show whether or not there[ was] variance in the claims submission behavior from providers within [a particular] peer group."

[9]   Kelly prepared a spreadsheet summary, which outlined a portion of the recovery sought by MFD.

[10]   The fiscal agent was "tasked with certain responsibilities to support the administrat[ion] of the Medicaid program," including "processing" all claims submitted for payment.  The fiscal agent had the authority to "pay" and "deny" claims, and had a Fraud and Abuse Unit that worked in cooperation with MFD to investigate providers suspected of fraud.

[11]   Grissom and Michelle Bunting, both principals, were permitted to proceed pro se in accordance with N.J.A.C. 1:1-5.1, 1:1-5.4(b)(4)(vi), and 1:1-2.1.

and Mercer, respectively. In total, over fifty exhibits were admitted into evidence.

Grissom, who served as Mercer's regulatory compliance officer along with outside counsel, testified that each year, the Department of Health sent a team to Mercer to evaluate its records. The first three years, the Department noted deficiencies that the facility promptly rectified. According to Grissom, during these evaluations, no Department representative notified Mercer that it was enrolling children who did not meet the eligibility criteria. Grissom stated that although MFD evaluated Mercer's records in 2004 and again in 2007, it was not until 2011 that MFD notified Mercer that there was a problem.

According to Smith, MFD's audit of Mercer was a lengthy process because of "the volume." She testified that she personally audited files for fifty children. Upon completing her examination, she provided notes summarizing her findings and ultimately identified eighteen children she believed did not qualify for PMDC services. When questioned about the eligibility criteria she used in evaluating the records, she responded that "[i]t could have been a combination of both [N.J.A.C. 8:87 and 8:86] because they d[id] overlap."

After Smith left MFD in 2011, McCafferty took over and reviewed the records from Mercer as well as the corresponding pediatrician records,

"focus[ing] on the care rendered to the children while they were at [Mercer], the medications [and treatments] administered, . . . [and] any type of assessments . . . that would relate to their diagnosis." She reviewed the records "to determine if what [was] billed [was] supported by documentation." Ultimately, based on "medical necessity" and the "medical eligibility" requirements of N.J.A.C. 8:86, she concluded that none of the eighteen children "were technology dependent," required "continued monitoring" or "ongoing care of a professional [l]icensed or [r]egistered [n]urse" as "evidenced by the rare occasion of medication administration." McCafferty explained that the regulation required "a need for continued monitoring by a professional nurse, not intermittent [care]" as reflected in the records. When asked on cross-examination whether Mercer should have discharged the children when they no longer met the medical eligibility criteria, McCafferty responded that there should have been "other arrangements made for the children, for example, a regular day[ care] or another caregiver." She added that, "in most of the cases[, MFD] gave a [thirty] day grace period" for the child to be "transitioned to other care if necessary."

Both McCafferty and Smith agreed that the "asthma treatment records for the . . . children only reflected prescriptions for medication PRN, meaning to be administered as needed, and—based on [Mercer's] notes—'as needed' turned out

to be rarely or even never." According to McCafferty, "all of the children . . . submitted for recovery . . . had time approved prior to the period of the recovery[.]" Because a doctor had initially prescribed PMDC services for each of the eighteen children under review, McCafferty referred the matter to Dr. Lind for peer review because "only a physician . . . can deny . . . service[s] . . . or limit a service requested by another physician."

Dr. Lind reviewed the records of the eighteen children who met "the age criteria" for evidence of "technology dependence" or "medical instability" in accordance with the eligibility criteria in N.J.A.C. 8:86. According to Dr. Lind, "medical instability was defined [in the regulations] as requiring . . . ongoing care to maintain health" by "a [RN] or a [LPN]." After recounting in detail the medical history and treatment of each of the eighteen children, all of whom had an initial diagnosis for asthma, he concluded that only two of the children qualified as medically unstable, primarily due to "overwhelming psycho[-]social stressors" caused by homelessness, where the family was unable "to deliver the care . . . [the] child need[ed] within a home setting."

Dr. Lind acknowledged that while several children presented with extremely challenging problems and had significant physical and mental disabilities, the use of medical pediatric day care centers was limited to children

10

who needed ongoing nursing care. Otherwise, Dr. Lind believed the program would be unsustainable. He indicated that to determine which social stressors were sufficiently egregious to qualify, "a provider" should "look at whether care delivery in the home [was] a possibility" to determine clinical eligibility. When challenged on cross-examination about the subjective nature of such an approach, Dr. Lind responded that "[t]echnically, if you read the regulation narrowly, there are no social stressors that will qualify a patient for medical day[ care] at all." Dr. Lind explained that "social stressors by themselves [were] not an admission criteria." However, he tried to "take as broad a view as possible" because "technically," none of the children "[met] the criteria if you look[ed] at a narrow interpretation of the regulation." Ultimately, based on Dr. Lind's opinions, which were consistent with the investigative findings, MFD concluded that sixteen of the eighteen children did not meet the regulatory standards for clinical eligibility to receive PMDC services, and filed the ensuing Notice of Claim against Mercer.

In contrast to Dr. Lind, after reviewing the files of the eighteen children, Dr. Kairys opined that all but four of the children met the clinical eligibility criteria under N.J.A.C. 8:86. Dr. Kairys described the eligibility criteria as requiring "technology dependence," and "a need for continuous nursing

involvement and care," as well as consideration of "the tremendous social stresses, pressures, [and] behavioral issues that may have impacted that particular child." According to Dr. Kairys, "overwhelming social, family, [and] behavioral stressors, . . . directly impact[] medical stability," and continuous nursing services encompassed more than daily medication administration. Rather, continuous nursing services required "general health oversight and surveillance and monitor[ing of] the child's condition . . . and . . . health status for that particular day."

Dr. Kairys agreed with Dr. Lind that for at least two of the children, "their social needs were so overwhelming that it met the medical instability" criteria. However, Dr. Kairys believed that the additional children he identified as eligible "were just as medically unstable" because of their "overwhelming" "social[,] . . . behavioral[,] and family issues." Based on his experience working closely with pediatricians in Mercer County, Dr. Kairys explained that, based on the pressing "[social] issues," the "pediatricians had nowhere to go with these kids" and "[s]o when there was an option like medical day[ care], where they thought the kids would get more comprehensive services, . . . they latched on to that as a great resource for these kids." Dr. Kairys believed Mercer "did a wonderful job with the kids . . . and they were not out to defraud anybody[.]"

12                                                                                                   A-3804-16T3

Following the hearing, on January 5, 2017, the ALJ issued an initial decision allowing recovery for only five of the sixteen children based on factual findings consistent with the witnesses' testimony and the judge's interpretation of the governing regulation.  Initially, the ALJ posited that the issue was "whether [Mercer] knowingly provided care and billed Medicaid for sixteen children whose medical conditions were not so severe as to require nursing intervention."  In that regard, the ALJ explained the parties' respective positions, noting that MFD characterized all sixteen children "as having asthma that did not require daily treatment with medicine at the facility."  On the other hand, Mercer contended "that all the children had prescriptions for their care from physicians[,]" a fact the ALJ found undisputed, and many "suffered from conditions that required an unusual level of care, and had social stressors at home that rendered the likelihood of appropriate treatment there highly uncertain."

The ALJ acknowledged Mercer's contention that the regulation was "not . . . clear," as well as Mercer's interpretation of the regulation, finding medical instability in children who came from "households where the psycho-social stressors . . . impact[ed] the child's health" and "reduc[ed] the likelihood of

13

adequate monitoring in the home." The ALJ also acknowledged Mercer's fundamental argument

> that doctors, not day care center administrators and nurses, evaluate the health of children and write prescriptions based on medical definitions. Therefore, since Mercer had a proper prescription for all sixteen children, Mercer [could not] be held financially responsible for what [was] either a dispute with a doctor over medical necessity, or a long-after-the-fact alteration to the interpretation of the core regulations.

Nonetheless, the ALJ expressly rejected Mercer's attempt to confine any recovery to violations of N.J.A.C. 8:87, as cited in MFD's Notice of Claim. According to the ALJ, MFD "stated clearly and repeatedly that they narrowed the scope of the original demand letter," to "sixteen cases" encompassing "the time period from 2005 through 2009." The ALJ explained that because N.J.A.C. 8:86 "governed the eligibility requirements for the PMDC program from 2001 to 2010, when it was replaced by [N.J.A.C.] 8:87[,]" "which was not effective until November 16, 2009, and not operative until April 1, 2010," see 41 N.J.R. 4257(a), any recovery was "wholly based on violations of [N.J.A.C.] 8:86-1.1[(a)] and [N.J.A.C.] 8:86-1.4(b)[(6)(i)]."

The ALJ recounted in detail the regulatory history of N.J.A.C. 8:86 and 8:87, noting that in 2005, the Department of Health and Senior Services (DHSS)

first attempted "to strengthen" N.J.A.C. 8:86, by adopting new rules which became operative on February 1, 2006. Specifically,

> DHSS maintained the existing "technology dependent" requirement but changed the "need ongoing treatment" criterion to "[b]e medically unstable requiring ongoing treatment." [N.J.A.C. 8:86-1.5 (2006)] (former[ly] [N.J.A.C.] 8:86-1.5(j)). Those rules also newly provided that "[t]he Department may, at its discretion, require prior authorization of eligible Medicaid beneficiaries by professional staff designated by the Department prior to the provision of services in a new or existing pediatric day health services facility." []Ibid.[] (former[ly] [N.J.A.C.] 8:86-1.5(k)). However, DHSS could, "for reasons of administrative convenience, authorize staff of the facility to perform the eligibility assessment on the Department's behalf." []Ibid.[] (former[ly] [N.J.A.C.] 8:86-1.5(e)).

The ALJ explained that, notwithstanding these changes, the dramatic rise in program costs prompted DHSS to replace N.J.A.C. 8:86 with N.J.A.C. 8:87, which DHSS described as "new rules . . . to 'establish clinical eligibility and prior authorization standards that are more rigorous and stringent than the [existing] standards' for the PMDC program." See 41 N.J.R. 4257(a). "According to DHSS, '[i]mplementation of a system of prior authorization by the Department based upon use of a functional assessment and more precise eligibility criteria would provide a reasonable solution to ensure proper use of

A-3804-16T3

PMDC services' and 'result[] in some PMDC facilities realizing a lower participation rate.'" See 40 N.J.R. 6328(a).

Relying on Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313, 337 (1984), the ALJ explained "fairness dictates that regulations must be 'sufficiently definite' and, generally 'prospective in nature[,]'" "'subject to certain exceptions,'" none of which applied in this case. See Seashore Ambulatory Surgery Ctr., Inc. v. N.J. Dep't of Health, 288 N.J. Super. 87, 98 (App. Div. 1996) (explaining that "retroactive application can only apply if such application will not result in 'manifest injustice' to a party adversely affected" (quoting Gibbons v. Gibbons, 86 N.J. 515, 523 (1981))). However, according to the ALJ, contrary to Mercer's claim of selective enforcement, "an agency is generally not prevented from enforcing an existing regulation that it had previously failed to enforce."

Applying these principles, the ALJ found that

> the regulatory history of the PMDC regulations indicates that in rejecting the eligibility of the sixteen children for the period sought, [MFD was], for the most part, prospectively applying a rule that did not take effect until 2010. While [MFD] allege[d] . . . that Mercer "knew that the children . . . did not require continuous nursing care . . . as required by [N.J.A.C.] 8:86," the regulatory history of the PMDC eligibility regulations includes an apparent concession by DHSS that [N.J.A.C.] 8:86 was not sufficiently definite, and

that at all times relevant to this matter the regulations "allowed the admission of children to PMDC facilities based solely on an asthma diagnosis, regardless of [the] severity of the condition and need for ongoing skilled nursing intervention." DHSS acknowledged that, under [N.J.A.C.] 8:86, "the fact that pediatric day health services facilities admitted many children based solely on an asthma diagnosis was problematic" and, accordingly, replaced [N.J.A.C.] 8:86 with [N.J.A.C.] 8:87 to "establish clinical eligibility and prior authorization standards that are more rigorous and stringent than the [existing] standards" for the PMDC program.

Thus, the ALJ determined that for the 2005 claims, MFD was bound by the provisions of N.J.A.C. 8:86, prior to the 2006 changes. Because the regulation at that time "allowed the admission of children to PMDC facilities based solely on an asthma diagnosis, regardless of [the] severity of the condition and need for ongoing skilled nursing intervention," with respect to the children admitted by Mercer during that period, the ALJ concluded "there was no violation to penalize." The ALJ continued that "[b]ased on the February 1, 2006[ rule] change, [DHSS] could have moved to pre-authorization for the children entering Mercer, but chose not to do so." However, according to the ALJ, "[i]ts election not to pre-authorize does not negate the fact that going forward from February 1, 2006, providers were on notice that the clinical standard had notched

17

up from 'need ongoing treatment' to 'medically unstable requiring ongoing treatment'" and so "[c]learly[,] after 2006, some sort of instability was required."

Acknowledging that "DHSS never defined 'ongoing'" in the regulation, the ALJ looked to dictionary definitions, as prescribed in <u>Macysyn v. Hensler</u>, 329 N.J. Super. 476, 485 (App. Div. 2000), to discern its "common meaning." <u>See</u> <u>Darel v. Pa. Mfrs. Ass'n Ins. Co.</u>, 114 N.J. 416, 425 (1989) ("When a popular or common word is used in a statute [or regulation], but is not defined, the word should be given its common meaning." (internal quotation marks and citation omitted)). Relying on dictionary definitions, the ALJ concluded that "[t]reatment that does not exist cannot be ongoing."

Applying the February 1, 2006 clinical standard to the medical records of the sixteen children, as recounted in detail by the experts, the ALJ determined that "two of the children—A.A. and Z.C.—received no asthma treatment at all in their time at Mercer, and three others—T.C., K.P., and S.P.—no treatments for two or more years." The ALJ explained:

> The prescribing physician was not in the best position to assess how much daily treatment the child actually was receiving from a[n] [RN] or [LPN] at the center. [Mercer] was in that position, and at some point had a duty under the regulations to discharge the child, or at [a] minimum, address the issue explicitly with the prescribing physician. There is no evidence it did so. Therefore, I [conclude] that for these five children,

[MFD] ha[s] carried [its] burden. . . . For the two who received none, after the first year at the center, they clearly were ineligible. For the three others, after a year without treatment, they also clearly ceased to be eligible.

With regard to the rest, however, while asthma treatments were irregular, they did exist. Moreover, as noted by Dr. Kairys, for at least eight of the children, the physicians were prescribing based on the glaringly problematic overall state of the child, and the significance of problems at home that made adequate medical attention there a dicey proposition. For the eleven children who had ongoing prescriptions and did receive treatment, however sporadic, I [conclude] that they remained eligible until the Department finally changed the rules in 2010.

Thus, the ALJ determined that MFD may recover funds and associated penalties for claims "improperly billed by Mercer for A.A. and Z.C. one year after admission, and for T.C., K.P., and S.P. for periods following one year after the last treatment for asthma."

Both Mercer and MFD filed exceptions to the ALJ's decision. On March 10, 2017, the Director of DMAHS issued a final agency decision, adopting "the findings, conclusions[,] and recommended decision of the [ALJ,]" but modifying "the decision to include one additional [child]" for which MFD "[could] recover overpayment and penalty." The Director explained:

In [e]xceptions, MFD notes that the standard applied by the ALJ also encompasses J.L. I agree.

19                                                      A-3804-16T3

J.L.[] . . . attended Mercer from February 2005 until August 2009. She received three nebulizer treatments in 2005, three in 2006, none in 2007, none in 2008[,] and none in 2009. As no evidence was presented that J.L. was receiving ongoing or even intermittent treatment for three years, she should also be included in the awarded recovery for the period following one year after her last treatment for asthma.

In rejecting "Mercer's argument that MFD should not be able to recover for [any of the children] because [N.J.A.C.] 8:86 permitted admission 'solely on an asthma diagnosis, regardless of the condition and need for ongoing skilled nursing intervention[,]'" the Director stated:

The ALJ correctly noted that effective February 1, 2006, [N.J.A.C.] 8:86 included the requirement that candidates for PMDC be "medically unstable requiring ongoing treatment." [N.J.A.C.] 8:86-1.15(i) and (j). All of the [children] at issue were admitted on a diagnosis of asthma. A.A. and Z.C.[] never received treatment for asthma during their time at Mercer and T.C., K.P., S.P., and J.L.[] ceased to be treated for asthma for two or three years. I agree with the ALJ that treatment that does not exist or had ceased to exist for more than a year's time cannot be ongoing or even intermittent.

This appeal followed.

On appeal, Mercer argues that DMAHS' decision to hold Mercer "responsible for ensuring that the PMDC services provided to the [six] [c]hildren were 'medically appropriate,'" and for "discharging [c]hildren" who "have prior

authorization from the DHSS to receive PMDC services" and "were deemed eligible via their physician orders," violate "both express and implied legislative policies governing the [a]gency." Further, Mercer asserts that DMAHS' decision that it violated N.J.A.C. 8:86 "is totally unsupported by competent substantial evidence[,]" and "the recovery of overpayments sought under the final decision is arbitrary, capricious[, and] unreasonable" because "the ALJ did not allow [N.J.A.C.] 8:87 to be considered at the hearing," despite MFD's reliance on that regulation in its Notice of Claim. Further, according to Mercer, "the principal recovery amount of $319,403 cannot be substantiated." We disagree.

II.

We begin by addressing our standard of review and the governing legal principles. Our role in reviewing an agency decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011) (citing Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). Indeed, we will "intervene only in those rare circumstances in which an agency action is clearly inconsistent with its statutory mission or other state policy." In re Musick, 143 N.J. 206, 216 (1996). In particular, "[d]elegation of authority to an administrative agency is construed liberally when the agency is concerned with the protection of the health and welfare of the public." Barone

21                                                          A-3804-16T3

v. Dep't of Human Servs., Div. of Med. Assistance & Health Servs., 210 N.J. Super. 276, 285 (App. Div. 1986), aff'd, 107 N.J. 355 (1987).

Thus, our task is limited to deciding

> (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [A.B. v. Div. of Med. Assistance & Health Servs., 407 N.J. Super. 330, 339 (App. Div. 2009) (quoting George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27 (1994)).]

We have previously stated that "[w]here [an] action of an administrative agency is challenged, 'a presumption of reasonableness attaches to the action . . . [,] and the party who challenges the validity of that action has the burden of showing that it was arbitrary, unreasonable[,] or capricious.'" Barone, 210 N.J. Super. at 285 (quoting Boyle v. Riti, 175 N.J. Super. 158, 166 (App. Div. 1980)). Furthermore, an agency's interpretation of its own regulations "is entitled to great weight since [it] is in the best position to understand what was meant by the regulation when it was promulgated." In re Hosps.' Petitions for Adjustment of Rates for Reimbursement of Inpatient Servs. to Medicaid Beneficiaries, 383

N.J. Super. 219, 239 (App. Div. 2006) (citation omitted).  However, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue."  R.S. v. Div. of Med. Assistance & Health Servs., 434 N.J. Super. 250, 261 (App. Div. 2014) (quoting Mayflower Sec. Co. v. Bureau of Sec. in Div. of Consumer Affairs of Dep't of Law & Pub. Safety, 64 N.J. 85, 93 (1973)).

The federal Medicaid Act, under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 to 1396v, authorizes a joint federal-state program to provide financial assistance to individuals whose income and resources are insufficient to meet the costs for necessary medical services.  42 U.S.C. § 1396a. Participation in the Medicaid program is optional for states; however, "once a State elects to participate, it must comply with the requirements" of the Medicaid statute and federal regulations in order to receive Medicaid funds.  Harris v. McRae, 448 U.S. 297, 301 (1980).  New Jersey's participation in the federal Medicaid program was authorized by the enactment of the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5.  Under its enabling legislation, the Director of the New Jersey Department of Human Services has the authority to promulgate the rules, regulations, and

administrative orders necessary to administer the Medicaid program. N.J.S.A. 30:4D-17.1(c).

DMAHS is the agency within the state Department of Human Services specifically charged with the administration of the Medicaid program. N.J.S.A. 30:4D-4. Under this authority, DMAHS is responsible for protecting the interest of the New Jersey Medicaid Program and its beneficiaries. N.J.A.C. 10:49-11.1(b). To that end, among other things, DMAHS implements a State fraud detection and investigation program for the identification, investigation, and referral of suspected fraud and abuse cases involving Medicaid providers under a federally approved plan. See 42 C.F.R. § 455.1 to -.3. Once approved, the state must follow the plan, or risk losing federal funding. 42 U.S.C. § 1396c.

We agree with the ALJ's and the Director's interpretation of N.J.A.C. 8:86, to support the recovery for the six children for the time period 2005 to 2009, and we agree with their determination that N.J.A.C. 8:86, rather than N.J.A.C. 8:87, governed the eligibility requirements for the PMDC program for that period. "The general rule is that . . . regulations have prospective effect." Seashore Ambulatory, 288 N.J. Super. at 97. "Prospectivity is favored because 'retroactive application . . . involves a high risk of being unfair.'" Ibid. (quoting Gibbons, 86 N.J. at 522). Although "the prospectivity rule is subject to certain

exceptions[,]" none of those exceptions applies here. Ibid. (explaining that "regulations may be retroactively applied where 'the Legislature has expressed its intent, either explicitly or implicitly,' that they should be so applied, 'when the reasonable expectations of those affected by the [regulations] warrant such application,' or when the regulation is ameliorative or curative") (alteration in original) (quoting Twiss v. State, Dep't of Treasury, 124 N.J. 461, 467 (1991))).

Here, the six children in question did not satisfy the eligibility criteria of N.J.A.C. 8:86 because they did not receive "ongoing" treatment while at Mercer. Thus, we are satisfied there was no violation of legislative policies. On the contrary, in applying the legislative policies to the facts, the agency reached a conclusion that was amply supported by substantial evidence in the record. R. 2:11-3(e)(1)(D). Therefore, Mercer has failed to meet its burden of showing that the agency action was arbitrary, unreasonable, or capricious.

We also reject Mercer's argument that the ALJ abused her discretion, "violated Mercer's federal rights to due process[,]" and "erred in allowing [MFD] to change the regulatory scheme upon which it was relying" after the hearing commenced. As the ALJ noted, any prejudice to Mercer was cured by the protracted hearing dates, during which Mercer was able to fully litigate the case and procure an expert to rebut MFD's claims of clinical ineligibility under

25

N.J.A.C. 8:86. Indeed, the ALJ relied heavily on the testimony of Mercer's expert to reject MFD's claims of ineligibility under N.J.A.C. 8:86 for eleven of the sixteen children. Moreover, we are hard pressed to conclude that Mercer was prejudiced by the change because Mercer would have fared no better had the heightened criteria of N.J.A.C. 8:87 applied.

Thus, we are satisfied there was no abuse of discretion under the circumstances presented herein. See Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) ("[A]buse of discretion only arises on demonstration of 'manifest error or injustice'") (quoting State v. Torres, 183 N.J. 554, 572 (2005)); Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012) ("An abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" (internal quotation marks omitted) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

Further, there was no due process violation. Under 42 C.F.R. § 455.23(a), a "[s]tate Medicaid agency must suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud," and "[a] provider may request, and must be granted, administrative review where [s]tate law so requires." Upon suspending payments based on credible fraud

allegations, the state "must send notice" advising the provider "that payments are being suspended" and "the circumstances under which the suspension will be terminated"; "the general allegations"; "[the] types of Medicaid claims" affected; "the right to submit written evidence for consideration by [the] [s]tate Medicaid [a]gency"; and "the applicable [s]tate administrative appeals process and corresponding citations to [s]tate law." 42 C.F.R. § 455.23(b)(2).

N.J.A.C. 10:49-9.10 is the corresponding State regulation governing the withholding of Medicaid payments based on "reliable evidence of fraud or willful misrepresentation by a provider" and mirrors 42 C.F.R. § 455.23(b)(2)'s notice requirements. N.J.S.A. 30:4D-17(i) authorizes "the division or its fiscal agents . . . to withhold funds otherwise payable" to a provider who has received payments to which he or she is not entitled "[i]n order to satisfy any recovery claim asserted against [the] provider . . . , whether or not that claim has been the subject of final agency adjudication[.]"

Here, MFD complied with the statutory notice requirements, and Mercer received all the process it was due. The original time frame for which MFD sought recovery encompassed a time frame during which N.J.A.C. 8:87 was operative. MFD changed the regulation it initially relied upon when it narrowed the time frame, a change that benefitted Mercer. Although MFD changed the

27

regulation initially relied upon in its Notice of Claim, the "types of Medicaid claims" affected remained the same. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Moreover, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). Thus, even assuming the notice was inadequate, inadequate notice is a procedural irregularity that may be "'cured' by a subsequent plenary hearing at the agency level[,]" Ensslin v. Twp. of N. Bergen, 275 N.J. Super. 352, 361 (App. Div. 1994), as occurred here.

Likewise, we reject Mercer's contention, raised for the first time on appeal,[12] that the final decision should be vacated pursuant to Rule 4:50-1(e) and (f). In pertinent part, the rule permits "the court . . . [to] relieve a party . . . from

---

[12] Mercer also contends for the first time on appeal that "the principal recovery amount of $319,403 cannot be substantiated" because MFD failed to "provide the total number of overpayments to be recovered." We decline to consider the argument because it was not raised during the administrative appeal process. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (explaining that well-settled principle that "appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest'" (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959))).

a final judgment or order" if "the judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated," Rule 4:50-1(e), or "any other reason justifying relief from the operation of the judgment or order." R. 4:50-1(f). Our Supreme Court has cautioned that "[c]ourts should use [Rule] 4:50-1 sparingly, in exceptional situations[] . . . designed to provide relief from judgments in situations in which, were it not applied, a grave injustice would occur." Hous. Auth. of Morristown v. Little, 135 N.J. 274, 289 (1994).

To support its argument regarding Rule 4:50-1(e), Mercer asserts that the "changed circumstances" required under the rule arise from the fact that the previously filed "Certificate of Debt" does not correspond with the recovery authorized under the final agency decision and has therefore been "otherwise vacated[.]" This argument is devoid of merit. Regarding Rule 4:50-1(f), Mercer asserts "the exceptional circumstances" required under the rule are met by MFD's attempt to "[use] the final decision to circumvent federal Medicaid law" by essentially "withhold[ing] Medicaid payments under [N.J.S.A.] 30:4D-17(i)" without providing Mercer with due process. Having previously rejected Mercer's due process argument, Mercer's reliance on Rule 4:50-1(f) to achieve the same result must also fail.

To the extent any argument raised by Mercer has not been explicitly addressed in this opinion, it is because the argument lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION